FILED IN
COURT OF CRIMINAL APPEALS

March 3, 2015

ABEL ACOSTA, CLERK

PD-1340-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/3/2015 10:16:15 AM
Accepted 3/3/2015 10:27:24 AM
ABEL ACOSTA
CLERK

# No. PD-1340-14

In the
Court of Criminal Appeals

——————◆——————

No. 14-13-00375-CR
In the Court of Appeals for the Fourteenth District of Texas at Houston

——————◆——————

No. 1253665
In the 174th District Court of Harris County, Texas

——————◆——————

# KEVIN LAVELLE KENT
*Appellant*
V.
# THE STATE OF TEXAS
*Appellee*

——————◆——————

# STATE'S BRIEF ON DISCRETIONARY REVIEW

——————◆——————

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
TBC No. 796910
kugler_eric@dao.hctx.net

**KAYLINN WILLIFORD**
**PAULA HARTMAN**
Assistant District Attorneys
Harris County, Texas

1201 Franklin, Suite 600
Houston, Texas 77002
Tel.: 713-755-5826
FAX: 713-755-5809

*Counsel for Appellee*

ORAL ARGUMENT PERMITTED

## STATEMENT REGARDING ORAL ARGUMENT

This Court has permitted oral argument in this case.

## IDENTIFICATION OF THE PARTIES

Counsel for the State:

**Devon Anderson** — District Attorney of Harris County

**Eric Kugler** — Assistant District Attorney on appeal

**Kaylinn Williford; Paula Hartman** — Assistant District Attorneys at trial

Appellant or criminal defendant:

**Kevin L. Kent**

Counsel for Appellant:

**James Pons** — Counsel on appeal

**James Brooks; John Still** — Counsel at trial

Trial Judge:

**Hon. Ruben Guerrero** — Presiding Judge

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT..................................................1

IDENTIFICATION OF THE PARTIES ...........................................................1

INDEX OF AUTHORITIES..........................................................................3

STATEMENT OF THE CASE.......................................................................5

ISSUES PRESENTED..................................................................................5

   A.   The court of appeals should not have reversed the trial court's decision to reject the appellant's proposed application paragraph because the paragraph was not authorized by the indictment and was an incorrect statement of the law. .......5
   B.   The court of appeals erred in holding that jurors must unanimously agree beyond a reasonable doubt on each underlying transaction used to comprise an aggregate theft charge. .......................................................................5
   C.   The court of appeals erred in finding that the appellant was harmed by any unanimity error in the jury charge because his defense was not predicated on isolating one transaction from another. ...........................................................5

STATEMENT OF FACTS ...........................................................................6

SUMMARY OF THE ARGUMENT .............................................................14

ARGUMENT ..........................................................................................14

PRAYER ...............................................................................................29

CERTIFICATE OF SERVICE AND COMPLIANCE..........................................30

# INDEX OF AUTHORITIES

**CASES**

*Almanza v. State*,
   686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g) ....................................26

*Burrell v. State*,
   526 S.W.2d 799 (Tex. Crim. App. 1975)..........................................................19

*Byrd v. State*,
   336 S.W.3d 242 (Tex. Crim. App. 2011)..................................................... 23, 26

*Cada v. State*,
   334 S.W.3d 766 (Tex. Crim. App. 2011)..................................................... 17, 19

*Curry v. State*,
   30 S.W.3d 394 (Tex. Crim. App. 2000)............................................................19

*Francis v. State*,
   36 S.W.3d 121 (Tex. Crim. App. 2000)............................................................22

*Garza v. State*,
   344 S.W.3d 409 (Tex. Crim. App. 2011)..................................................... 23, 24

*Harrell v. State*,
   834 S.W.2d 540 (Tex. App.—
   Houston [14th Dist.] 1992, pet. ref'd)..............................................................17

*Jourdan v. State*,
   428 S.W.3d 86 (Tex. Crim. App. 2014).............................................................19

*Kent v. State*,
   447 S.W.3d 408 (Tex. App.—
   Houston [14th Dist.] 2014, pet. granted)..................................................... passim

*Kitchens v. State*,
   823 S.W.2d 256 (Tex. Crim. App. 1991)...........................................................17

*Lehman v. State*,
   792 S.W.2d 82 (Tex. Crim. App. 1990)................................................. 17, 18, 23

*Murchison v. State*,
93 S.W.3d 239 (Tex. App.—
Houston [14th Dist.] 2002, pet. ref'd)........................................................ 17, 18

*Pizzo v. State*,
235 S.W.3d 711 (Tex. Crim. App. 2007)...........................................................19

*Richardson v. United States*,
526 U.S. 813 (1999) ..........................................................................................20

*Schad v. Arizona*,
501 U.S. 624 (1991) ................................................................... 22, 23, 24

*Smith v. State*,
298 S.W. 286 (Tex. Crim. App. 1927)...............................................................19

*State v. Weaver*,
982 S.W.2d 892 (Tex. Crim. App. 1998)...........................................................25

## STATUTES

21 U.S.C. § 848(c) ...........................................................................................20

TEX. PENAL CODE § 21.02 (West 2010) ...........................................................21

TEX. PENAL CODE § 25.11 (West 2010) ...........................................................21

TEX. PENAL CODE § 31.03 (West 2010) ...........................................................20

TEX. PENAL CODE § 31.09 (West 2010) ................................................. 16, 20, 21

## OTHER AUTHORITIES

Act of May 17, 2007, 80th Leg., ch. 593, § 1.17, 2007 Tex. Sess. Law Serv. Ch.
593 .............................................................................................................21

Act of May 23, 1973, 63rd Leg., ch. 399, § 1, 1973 Tex. Sess. Law Serv. Ch. 399 21

Act of May 31, 2009, 81st Leg., ch. 665, § 1, 2009 Tex. Sess. Law Serv. Ch. 665 21

**TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:**

## STATEMENT OF THE CASE

The appellant was charged with the aggregate theft of money from two families over a five-year period (CR – 13). The jury found the appellant guilty, and the trial court thereafter assessed punishment at 60 years in prison (CR – 615). The court of appeals reversed the conviction and held that the jury was required to unanimously agree on each individual transaction that comprised the aggregate theft charge. *Kent v. State*, 447 S.W.3d 408 (Tex. App.—Houston [14th Dist.] 2014, pet. granted). This Court granted review.

## ISSUES PRESENTED

A.   **The court of appeals should not have reversed the trial court's decision to reject the appellant's proposed application paragraph because the paragraph was not authorized by the indictment and was an incorrect statement of the law.**

B.   **The court of appeals erred in holding that jurors must unanimously agree beyond a reasonable doubt on each underlying transaction used to comprise an aggregate theft charge.**

C.   **The court of appeals erred in finding that the appellant was harmed by any unanimity error in the jury charge because his defense was not predicated on isolating one transaction from another.**

## STATEMENT OF FACTS

In 1981, JoAnn and Larry Aniol opened River Gardens in New Braunfels, Texas; it was a 70-acre, full-time treatment facility for "handicapped mentally retarded adults" with more than 250 employees (RR. V – 15-16). Larry was the clinical psychologist while JoAnn was the business manager (RR. V – 17).

At a provider meeting in 2002, JoAnn told Marilyn Cochran that she was very ill with a bone disease and wanted to sell River Gardens (RR. V – 17-18). Cochran owned group homes in Texas and was interested in brokering commercial deals for the transfers of such facilities (RR. V – 17). Cochran put the Aniols in touch with a potential buyer named Barbara Allen (RR. VI – 38). Barbara and her daughter Tamara Allen ran a similar facility in Brownsville and wanted to grow their business (RR. VI – 35-37). The sales price for River Gardens was $19.5 million (RR. V – 21).

Cochran also put both the Allens and the Aniols in touch with the appellant, a purported mortgage broker, who was supposed to find financing for the Allens (RR. V – 19-20, 42) (RR. VI – 39, 139-140). Cochran claimed that she had done some deals with the appellant in the past, but that was not true (RR. V – 27). The Aniols paid Cochran a brokerage fee of $150,000 (RR. V – 27-28). After that, Cochran was no longer involved in the transaction (RR. V – 28-29) (RR. VII – 36).

6

The appellant did business under several names, one of which was the Orlando Mortgage Company allegedly based in Pearland, Texas (RR. V – 25, 32-36) (RR. VI – 40) (RR. VII – 11). Another of the appellant's companies was called Distinguished Properties; it was also located at the same address in Pearland and was allegedly a real estate development investment company (RR. V – 26).

The appellant's website made it appear that Orlando Mortgage was a huge company, but it was not (RR. VI – 40-41, 43). The appellant's business address was actually just a mailbox rental place (RR. V – 179) (RR. VI – 127-128). The appellant had no physical office address and no employees at Orlando Mortgage (RR. V – 179-182, 191). "Darrell Ellis" was listed as the director of the corporation, but there was no evidence of any real person by that name (RR. VII – 13-14).

The appellant told the Allens that he could finance the entire transaction so that they would not have to put up any money (RR. VI – 45, 48). He had one face-to-face meeting with the Aniols, but the remainder of the business transaction was handled by telephone and fax (RR. V – 21). And the appellant never met with the Allens (RR. VI – 40).

The appellant told the Allens and the Aniols that his father was well-connected with Texas One Credit and was willing to help the appellant add such a large sale to his résumé (RR. V – 42-43) (RR. VI – 48-49). But the appellant's

7

father was actually a flooring contractor, not a banker, and he was estranged from his son at that time (RR. VI – 9-12, 25-26, 122). Furthermore, Texas One was not available to issue a $50 million line of credit (RR. VI – 27-29).[1] Nevertheless, the appellant falsified communications with his father in order to trick the Aniols into believing that his father and Texas One were supporting the transaction (RR. VI – 14, 16-17, 20) (RR. VII – 34, 85-86).

In February 2003, the appellant allegedly approved a loan package of $25 million for the transaction, but he offered to drop the interest rate in exchange for a cash payment of $200,000 (RR. V – 44) (RR. VI – 54-55). The Aniols offered to front that money to the Allens in order to facilitate the deal; so they sent the money to the Allens, who in turn forwarded it to the appellant (RR. VI – 56-57). The appellant told the Aniols that the money was going into escrow (RR. V – 44-45). The appellant had no permission to spend that money on himself; rather, the money was to be returned to the Aniols after the transaction (RR. V – 46-47).

Shortly thereafter, the appellant offered to drop the interest rate some more for an additional payment of $100,000, and the Allens wired him that additional money (RR. VI – 60-61, 71-72, 74). The appellant then requested $125,000 as a "good faith" payment for "Ms. Carolyn and Ms. Sharon…the people at the bank

---

[1] In June 2010, Primeway Federal Credit Union absorbed Texas One Credit Union (RR. VI – 21-22). The appellant did have an account at Texas One at one time, but it was eventually closed by the credit union (RR. VI – 31).

8

who controlled all the loans." (RR. VI – 74-75). But the appellant did not work with anyone with either of those names (RR. VI – 137).

The appellant requested $369,528 as a "good faith deposit" from the Aniols to encourage his father to cement his relationship with Texas One, and they wired that money to Lawyer's Title, which they believed to be an escrow account (RR. V – 50-51). Shortly thereafter, JoAnn spoke with her brother, Tony Copp, who was an investor (RR. V – 51). After speaking with Copp, JoAnn requested the $369,528 back, and it was returned in September 2003 (RR. V – 52). The appellant said, "See, I sent your money back, you can trust me. Let's get this sale complete. I have all the documents in place. And we're almost there, we're almost there." (RR. V – 52). The Aniols really wanted to sell the property due to JoAnn's illness, so they decided to press on with the appellant's alleged deal despite their misgivings (RR. V – 52-53).

In October 2003, the appellant sent a fax to the Aniols that stated: "I spoke with my dad last night. He said send your deposit to Orlando Mortgage account. It's a business account. Not personal. It will be safe there." (RR. V – 56). The Aniols sent $300,000 to what they thought was the bank account for the appellant's father so that he could be instrumental in closing the loan (RR. V – 57, 66-67). And in February 2004, the Aniols sent another $150,000 to the appellant as part of the transaction (RR. V – 80, 88).

The appellant showed alleged commitment letters to the Allens and the Aniols; however, he blacked out the names of the banks in the letters (RR. V – 57-60, 79) (RR. VI –65-66) (RR. VII – 31). The blacked-out name was "Cameron Credit Union." (RR. VII – 77-78, 98-99). But the appellant admitted that he had changed that name himself (RR. VIII – 71). The appellant claimed that "Carolyn" with the loan committee was working on the deal, but the Aniols never met anyone named Carolyn who worked with the appellant (RR. V – 82-83). When the Aniols asked to speak with Carolyn, the appellant said, "Oh, no, you're not supposed to. You're the seller." (RR. V – 83) (RR. VI – 76).

The Aniols had already given the appellant $650,000 to facilitate the sale when they decided to hire their own attorney to examine the transaction (RR. V – 93-94). The Aniols wrote a letter to the appellant and demanded that the money be wired to their firm's escrow account, but the appellant responded, "your money is safe, it's in an escrow account, don't worry, you can trust me." (RR. V – 95). The appellant sent the Aniols an escrow agreement on August 3, 2004, which somewhat allayed their concerns (RR. V – 100-101). The escrow agreement implied that Texas One Credit Union was the lending institution (RR. V – 104-106).

By that point, the Aniols had transferred to the appellant $200,000 to buy down the interest rate, $300,000 for reserve debt service, and $150,000 for additional debt service (RR. V – 111-112). The appellant was not allowed to spend

any of that money on his personal items (RR. V – 88, 101, 109).  And the Aniols were supposed to receive that money back at the end of closing (RR. V – 88, 96, 162) (St. Ex. 283).  In fact, the appellant guaranteed in writing that the Aniols would receive back the $650,000 that they had advanced for the closing (RR. V – 106-107).  But the deal never closed (RR. V – 107).

In May 2005, the appellant asked for an additional $200,000 for debt service and stated that his father would be sending $820,962 to support the loan (RR. V – 114-116).  The Aniols then sent him that additional $200,000 (RR. V – 116).  In November 2005, the appellant volunteered to put up an additional $350,000 toward the deal if the Aniols would give an additional $200,000 (RR. V – 119-120).  When she received that fax, JoAnn was so disgusted that she wanted to scream (RR. V – 120).

On December 7, 2005, the Aniols called the appellant and told him that the deal was over, that the sale would not go through, and that he was to return their money (RR. V – 120-123).  The appellant said, "okay, fine, I'll go ahead and I'll call my bank and get that wiring sent over to you." (RR. V – 123).  But the Aniols never received any of their money back (RR. V – 107, 123) (RR. VII – 50).  The appellant employed numerous delaying tactics and even offered to buy River Gardens himself (RR. V – 124-126).  The total loss to the Aniols was $975,000 (RR. V – 130) (RR. VI – 82) (RR. VII – 9).

When the Aniols dropped out of the transaction, the appellant contacted Barbara Allen and told her that she should refocus on hotels (RR. VI – 81-82). He told her that he had returned all of the money to the Aniols (RR. VI – 82-83). He also told her that Orlando Mortgage could give her a $25 million line of credit, but that she had to continue putting up money as "good faith debt service" (RR. VI – 81, 83, 86, 89). From March 2006 through March 2008, the Allens gave the appellant an additional $337,000 (RR. VI – 83-84). But the appellant never closed on a hotel deal (RR. VI – 90-92). And the appellant did not have permission to spend that money on himself (RR. VI – 91, 108).

Eventually, Barbara acted on her own and put $50,000 earnest money down toward the purchase of a hotel in McAllen, Texas (RR. VI – 91-93). When she informed the appellant of this, he became enraged (RR. VI – 94). The Allens had had enough and sent a demand letter to the appellant in May 2008 for the return of their $488,000 (RR. VI – 103-105) (RR. VII – 10) (St. Ex. 62). But the appellant never returned any of the money (RR. VI – 108) (RR. VII – 50).

The appellant did not have $19 million in assets to secure a loan sufficient to purchase River Gardens (RR. VI – 162-163). Instead of depositing the money received from the Allens and the Aniols into an escrow account, he deposited the money into his personal accounts and spent the money on himself (RR. VII – 21-22, 109-111, 115-126). He spent the stolen money on football paraphernalia,

sports tickets and memorabilia, a Lincoln Navigator, a BMW, jewelry, furniture, and other personal expenses (RR. VI – 141, 143-148, 152-161) (RR. VII – 40-42, 129-135) (RR. VIII – 118, 157-166).

The appellant had numerous houses during the time of the scam, and he spent most of his time at home (RR. VI – 127-136, 142-143). He would watch television, play videogames, and shop on eBay (RR. VI – 142-143, 178-179). The appellant was married, but he also had a girlfriend during this time (RR. VI – 178).

The appellant testified in his own defense that he fabricated documents and lied to both the Allens and the Aniols in order to keep his three partners secret (RR. VIII – 65). But he could only remember the first name of one of his partners, and that alleged person never testified (RR. VIII – 65-66). He also could not remember the names of anyone he worked with at the alleged "backup" lending institution (RR. VIII – 88-89). Likewise, he did not know the whereabouts or contact information for any of the alleged shareholders in his various corporations (RR. VIII – 96-97, 102-105). He stole money from several other victims related to refinancing scams before he was finally arrested by the authorities (RR. VIII – 108-117, 146-149, 189-190) (RR. IX – 9-27, 36-38). Nevertheless, the appellant continued to solicit and lie to prospective clients well after he was arrested and up until four months prior to the trial of the case (RR. VIII – 122-125).

## SUMMARY OF THE ARGUMENT

The court of appeals held that the trial court erred in failing to give the appellant's requested jury instruction, which attempted to identify each separate transaction in the aggregate theft and to require unanimity on each one. But the requested instruction was incorrect because it was phrased in the conjunctive. Furthermore, such unanimity was not required because aggregate theft is considered to be one offense. Finally, the appellant was not harmed, either egregiously or otherwise, because his defense did not depend on separating and defeating each individual transaction.

## ARGUMENT

The appellant was charged with aggregate theft by "acquiring and otherwise exercising control over property, namely, MONEY, owned by Barbara Allen and Tamara Allen and Larry Aniol and Joann Aniol, hereafter styled the Complainant, with the intent to deprive the Complainant of the property and the total value of the property appropriated was over two hundred thousand dollars." (CR – 13). Any individual instances of theft were not specifically pled in the indictment because it was alleged that the appellant stole from the four complainants "pursuant to one scheme and continuing course of conduct" from May 15, 2003 through March 13, 2008 (CR – 13).

14

At the end of the guilt stage of trial, the appellant objected to the application paragraphs in the jury charge based on due process and due course of law "because they do not require the jury to agree unanimously that the State prove beyond a reasonable doubt each element of the offense." (RR. IX – 50). Specifically, the appellant requested that the trial court instruct the jury as follows:

> Now if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, the defendant, Kevin Lavelle Kent, heretofore on or about May 15, 2003, and continuing through March 13, 2008, did then and there unlawfully pursuant to one scheme or continuing course of conduct appropriate by acquiring or otherwise exercising control of the property, namely, money as follows….$200,000 from Larry and JoAnn Aniol deposited May 20, 2003; $100,000 from Barbara Allen deposited June 24, 2003; $125,000…$74,000 deposited March 17 of '06 from Barbara Allen; $10,000 deposited September 8, 2006, from Barbara Allen; $50,000 deposited October 20, '00 from Barbara Allen; $50,000 deposited November 30 of '06 from Barbara Allen; $15,000 deposited April 30, '07 from Barbara Allen; $15,000 deposited May 30, '07 from Barbara Allen; $30,000 deposited July 27 of '07 Barbara Allen; $13,000 deposited September 28 of '07 from Barbara Allen; $40,000 deposited December 30, '07 from Barbara Allen; $10,000 deposited January 11, '08 from Barbara Allen; $5,000 deposited February 28, '08 from Barbara Allen; $25,000 deposited February 28th of '08 from Barbara Allen 'May 14, '03 $200,000 from Larry and JoAnn Aniol – excuse me – October 29, '04, $300,000 from Larry and JoAnn Aniol; February 24, '04, $150,000 from Larry and JoAnn Aniol; and May 20, '05, $200,000 from Larry and JoAnn Aniol, with the intent to deprive Barbara Allen and Tamra Allen and Larry Aniol and JoAnn Aniol of the property total, and the total value of the property appropriated was over $200,000, then you will find the defendant guilty as charged in the indictment.

(RR. IX – 50-52). The prosecutor responded that the Penal Code allows the aggregation of theft charges and that the jury was not required to agree on the

15

specific transactions as long as they found that they added up to over $200,000 (RR. IX – 52).

The trial court agreed with the prosecutor, and the jury was charged on aggregate theft (RR. IX – 53) (CR – 607). Specifically, the jury was instructed that "When amounts are obtained by theft pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense." (CR – 606-607). The application paragraph tracked the indictment, albeit with the victims listed in the disjunctive, without attempting to further break down the appellant's scheme or continuing course of conduct into separate transactions (CR – 606-607). Finally, the jurors were instructed to certify their verdict only after they had "unanimously agreed upon a verdict," and they did reach a unanimous verdict (CR – 610, 612).

When amounts are "obtained in violation of this [theft] chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, *the conduct may be considered as one offense* and the amounts aggregated in determining the grade of the offense." TEX. PENAL CODE § 31.09 (West 2010) (emphasis added). Furthermore, where an indictment charges an individual with the appropriation of property in an aggregate amount pursuant to one scheme or continuous course of conduct, the State is not required to prove each individual appropriation; rather, it must prove theft of property described in the indictment in

an amount sufficient to satisfy the jurisdictional requirement of its pleading. *See Lehman v. State*, 792 S.W.2d 82, 83-85 (Tex. Crim. App. 1990); *Harrell v. State*, 834 S.W.2d 540, 543 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) ("It is sufficient if the State shows enough of the property was stolen to meet the aggregated value allegation.").

Under Texas law, the State may plead in the conjunctive and charge in the disjunctive. *See Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim. App. 2011) (citing *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)). Furthermore, because the individual transactions in an aggregate theft are essentially alternative manners and means of committing the charged offense, the trial court can properly instruct the jury in the disjunctive. *See Murchison v. State*, 93 S.W.3d 239, 257–58 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("Because it is proper to charge the jury in the disjunctive as to multiple manner and means for the commission of a single offense, we conclude the jury charge in this case did not violate appellants' right to a unanimous verdict"); *see also Lehman*, 792 S.W.2d at 84-85.

The court of appeals in the present case distinguished this Court's *Lehman* opinion by stating that it "did not address whether the jurors would have to unanimously agree from whom the defendant stole property." *Kent*, 447 S.W.3d at 420. And it further distinguished its own *Murchison* opinion by stating that the

court's "suggestion that *Lehman* addressed the issue of jury unanimity was dictum because it was not necessary to the ultimate disposition." *Id.*, 447 S.W.3d at 421. But the decision of the trial court to reject the appellant's proposed jury instruction in this case flowed naturally from both *Lehman* and *Murchison*.

The trial court properly refused to instruct the jurors as requested by the appellant that they were required to acquit if they did not find beyond a reasonable doubt that the appellant stole on "October 29, '04, $300,000 from Larry and JoAnn Aniol; February 24, '04, $150,000 from Larry and JoAnn Aniol; *and* May 20, '05, $200,000 from Larry and JoAnn Aniol." (RR. IX – 51) (emphasis added). *Lehman* explicitly does not require such proof because either the October 29 allegation or the May 20 allegation would have been sufficient by themselves to reach the statutory minimum; the State was not required to prove both. *Lehman*, 792 S.W.2d at 84-85 ("the State should be allowed to plead all property which the evidence may ultimately prove stolen without thereby being required to prove theft of any larger quantum of property than the statute at issue requires."). Furthermore, the trial court followed the language of *Murchison* to the letter. *See Murchison,* 93 S.W.3d at 257–58 ("it is proper to charge the jury in the disjunctive as to multiple manner and means for the commission of a single offense…").

Under the court of appeals ruling, prosecutors would no longer have control over how to define the transactions that form the basis of an aggregate theft charge,

18

and there would be an opportunity for substantial mischief during the charge conference. The appellant's proposed instruction would have inserted numerous instances of conduct that were not pled in the indictment (RR. IX – 50-52). But the "law as authorized by the indictment" consists of the statutory elements of the offense as those elements are modified by the indictment, and the State is required to prove that the defendant committed the alleged crime using that specific statutory manner and means. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Cada*, 334 S.W.3d at 773–74. Prosecutors have been warned by this Court for decades not to plead unnecessary details or be forced to prove them beyond a reasonable doubt. *Burrell v. State*, 526 S.W.2d 799, 802 (Tex. Crim. App. 1975) (citing *Smith v. State*, 298 S.W. 286 (Tex. Crim. App. 1927)). But allowing defendants to insert additional elements that were not pled in the indictment and after the evidence has been presented would eviscerate that rule. Moreover, it would encourage defendants to creatively spin the facts into as many separate transactions as possible in order to confuse and overburden the jurors.

The court of appeals used the grammatical statutory analysis from *Pizzo v. State*, 235 S.W.3d 711 (Tex. Crim. App. 2007), to dissect Section 31.09. *Kent*, 447 S.W.3d at 416. It then cited *Jourdan v. State*, 428 S.W.3d 86, 96 (Tex. Crim. App. 2014), for the proposition that the phrase "in violation of this chapter" from Section 31.09 was an adverbial phrase that represented "discretely actionable units

19

of prosecution." *Kent*, 447 S.W.3d at 417. But this Court has explicitly stated that "Ordinarily, we have not regarded adverbial phrases as 'elemental' for jury unanimity purposes." *Jourdan*, 428 S.W.3d at 96. And making the present case an exception to that rule subverts the legislative intent in creating "one offense," especially when all of the property was taken under the same statutory section. TEX. PENAL CODE § 31.09 (West 2010). As charged in the indictment, all of the money obtained from the Allens and the Aniols was a result of theft under Section 31.03 (CR – 13). TEX. PENAL CODE § 31.03 (West 2010) ("A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property."). Thus, there was no concern with joining separate statutory offenses under one umbrella offense; they all fell under the same statute.

The court of appeals cited *Richardson v. United States*, 526 U.S. 813, 817 (1999), for the proposition that the federal continuing criminal enterprise statute treats each violation as a separate element requiring unanimity. *Kent*, 447 S.W.3d at 418. The statute at issue in *Richardson* provided that a person commits an offense if he "violates any provision of this subchapter or subchapter II of this chapter," and that "such violation is a part of a *continuing series of violations* of this subchapter or subchapter II of this chapter." *See* 21 U.S.C. § 848(c) (emphasis added); *Richardson*, 526 U.S. at 815. But Section 31.09 does not use the term "series of violations." Rather, it provides for an offense when amounts are

20

obtained "in violation" of the theft chapter. TEX. PENAL CODE § 31.09 (West 2010). Thus, unlike Section 848(c), the text of Section 31.09 shows a Legislative intent to treat the "scheme or continuing course of conduct" as the culpable criminal behavior rather than each individual transaction used to prove the existence of that scheme or course of conduct.

The court of appeals stated that "the Legislature is well aware of how to except certain elements of penal statutes from the unanimity requirement when the elements require proof that a defendant committed multiple underlying criminal offenses." *Kent*, 447 S.W.3d at 419 (citing TEX. PENAL CODE §§ 21.02 and 25.11 (West 2010)). But Section 21.02, dealing with the continuous sexual abuse of a child, was created in 2007. Act of May 17, 2007, 80th Leg., ch. 593, § 1.17, 2007 Tex. Sess. Law Serv. Ch. 593. And Section 25.11, dealing with continuous family violence, was created in 2009. Act of May 31, 2009, 81st Leg., ch. 665, § 1, 2009 Tex. Sess. Law Serv. Ch. 665. Whereas the aggregate theft statute has been in existence since at least 1973. Act of May 23, 1973, 63rd Leg., ch. 399, § 1, 1973 Tex. Sess. Law Serv. Ch. 399. Moreover, the nature of the recent continuous offenses, which allow the combination of offenses across several chapters and only under specific conditions, do not lend themselves to the same grammatical pattern as Section 31.09, which is a blanket combination of all theft offenses. *Compare* TEX. PENAL CODE §§ 21.02 and 25.11 (West 2010) *with* TEX. PENAL CODE § 31.03

(West 2010). Thus, no clear Legislative intent may be inferred from the fact that the 80th and 81st Legislatures did not follow the grammatical lead of the 63rd Legislature, which passed the aggregate theft statute more than three decades earlier.

Interpreting Section 31.09 to make each individual transaction a separate element of the offense is an unworkable and unsound public policy. Complex thefts often involve numerous transactions. And in today's world of electronic finance, it can be very challenging to define where one transaction begins and another ends. In the present case, the appellant refunded money to his victims at times to build their confidence in him (RR. V – 52). But because money is fungible, such transactions further complicate the determination of which transactions were actually refunded. Moreover, an aggregate theft involving numerous amounts from numerous victims, such as a typical Ponzi scheme, would create such a lengthy jury charge that jurors would be overwhelmed at the task of sorting through it all.

Unlike *Francis v. State*, 36 S.W.3d 121 (Tex. Crim. App. 2000) , the present case did not involve multiple separate offenses. Rather, it was one ongoing offense of aggregate theft committed pursuant to one scheme or continuing course of conduct. And unlike *Schad v. Arizona*, 501 U.S. 624 (1991), it did not involve alternative and incompatible methods of committing the same offense. Rather, the

offense itself was composed of numerous consistent transactions which combined to satisfy the statutory elements. Thus, the jury was properly instructed to be unanimous with regard to that one offense (CR – 610). Furthermore, even if an additional unanimity instruction were required, the appellant's proposed instruction was clearly wrong when it conjoined all of the separate transactions and required a guilty verdict on each. *Compare* (RR. IX – 50-52) *with Lehman*, 792 S.W.2d at 84-85. Therefore, the court of appeals erred in holding otherwise.

The appellant claims that this Court has already decided the issue in this case. (App'nt Resp. PDR 3-7). He cites *Byrd v. State*, 336 S.W.3d 242, 250-51 (Tex. Crim. App. 2011); *Garza v. State*, 344 S.W.3d 409 (Tex. Crim. App. 2011); and *Schad* in support of this argument. But those cases are not helpful.

In *Byrd*, the defendant was charged with shoplifting from the owner, "Mike Morales," but at trial, the State proved that Wal-Mart owned the property and Morales was never mentioned. *Byrd*, 336 S.W.3d at 244. This Court held that the evidence was insufficient to sustain the conviction because the State was required to prove that the owner as shown by the evidence was the same as the owner alleged in the charging instrument. *Id.*, 336 S.W.3d at 252-253. This Court did, however, recognize that the name of the owner was not a substantive element of the offense of theft. *Byrd*, 336 S.W.3d at 251.

In *Schad*, the defendant was charged with first-degree murder under alternate theories of premeditated murder and felony-murder based on robbery. On appeal, Schad argued that his conviction under instructions that did not require the jury to agree on one of the alternative theories of premeditated and felony murder was unconstitutional. *Schad*, 501 U.S. at 630. A plurality of the Supreme Court rejected Schad's argument, holding that there is no constitutional requirement that the jury agree on a single means of committing an offense. *Id.*, 501 U.S. at 631. The Court noted, however, that there is a point at which the alternative means of committing a crime are so distinct as to constitute separate offenses. *Id.*, 501 U.S. at 633-34. Declining to create a bright-line test, the plurality determined that the issue would be resolved by analyzing how offenses have been defined historically and in wide practice. *Id.*, 501 U.S. at 638. The Court observed that the state legislature's definition of the elements of the offense is usually dispositive. *Id.*, 501 U.S. at 639.

Finally, Garza was a software technician at a private school who over the course of several years had been faking repairs on the students' laptop computers and then billing Hewlett Packard for those alleged repairs. *Garza*, 344 S.W.3d at 411. He was charged and found guilty of aggregated theft. On appeal, Garza claimed that the evidence was insufficient because while the alleged victim, Dennis Leahy, was an employee of Hewlett Packard at the time of the trial, he was

not such an employee at the time of the theft and therefore could not be the owner of the property. *Id.*, 344 S.W.3d at 412. This Court rejected Garza's argument, holding that Leahy was a special owner and was competent to attest to the value of the stolen property, even though he was not employed by Hewlett Packard at the time of many of the alleged thefts. *Id.*, 344 S.W.3d at 414.

In an apparent non sequitur, and contrary to *Lehman,* the *Garza* court also stated that "Each individual theft is an element of the aggregated theft described by § 31.09." *Id.* That announcement only makes sense when considered in light of its source in the citation, namely, *State v. Weaver*, 982 S.W.2d 892 (Tex. Crim. App. 1998). Weaver was accused of aggregate theft in Harris County and claimed that the constituent thefts that occurred outside Harris County must be severed from the charge. *Weaver*, 982 S.W.2d at 893. This Court disagreed, stating: "Section 31.09 clearly provides that several thefts 'pursuant to one scheme or continuing course of conduct' may be aggregated and 'considered as one offense.' Each individual theft and its elements aggregated under Section 31.09 is an element of the single offense created by Section 31.09." *Id.* (footnote omitted). That was the source of the puzzling language in *Lehman.* But the *Weaver* court went further than that, holding that "Section 31.09 creates one offense for purposes of severance, jurisdiction, punishment and limitations…[and] venue." *Id.*, 982 S.W.2d at 894.

Unlike *Byrd,* the present case was an aggregate theft committed pursuant to one scheme or continuing course of conduct; furthermore, the names of the alleged owners were repeatedly mentioned during the trial. And unlike *Schad*, it did not involve alternative and incompatible methods of committing the same offense. Rather, the offense itself was composed of numerous consistent transactions which combined to satisfy the statutory elements. Finally, while the loose language in *Garza* might at first blush appear to help the appellant, in context and in light of *Weaver*, it is clear that aggregate theft is for all intents and purposes one offense. And the jury was properly instructed to be unanimous with regard to that one offense.

Even if the jury charge contained objected-to error, the court of appeals erred in finding that the appellant was harmed by the lack of a more detailed unanimity instruction. In assessing whether some harm resulted from the alleged error, appellate courts must consider all relevant information revealed by the record, including the entire jury charge, the state of the evidence, and the arguments of counsel. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

The balance of the jury charge was correct, and the appellant did not complain about any other charge error on appeal. The jury was instructed to certify their verdict only after they "have unanimously agreed upon a verdict." (CR – 610). And they reached a unanimous verdict that the appellant had unlawfully

appropriated at least $200,000 pursuant to one scheme or continuing course of conduct from one specific victim (CR – 612).

The evidence of guilt was overwhelming. The appellant admitted to receiving well over $200,000 from the Allens and the Aniols and to spending it on himself; he merely claimed that it was for "services rendered." (RR. VIII – 64, 67-70, 118-119, 143-145). Furthermore, JoAnn, Barbara, and numerous fraud investigators testified in detail concerning the numerous transactions involved in the course of the theft (RR. V – 14) (RR. VI – 34) (RR. VII – 3, 62, 101). Finally, the appellant's evidence did not challenge the verity of the individual transactions but rather the nature of the entire relationship. Thus, if the jury were to acquit the appellant, it would not have been because they failed to find unanimity on the individual transactions but rather because they believed the appellant's claim to being a legitimate mortgage broker.

The argument of counsel, not surprisingly, followed the nature of the evidence. The defense argued that the appellant was "unorthodox" but was "working hard" for the money (RR. IX – 64, 67). And the State responded generally that the appellant was a "con man" and a liar (RR. IX – 82). Without explicitly addressing the unanimity instruction, the defense did argue:

> Your job, what you've got to do is basically go through these 20 transactions. And the State's – they're listed in the exhibits. And you're going to have to go through each and every one and say: Did the State prove beyond a reasonable doubt that on May 20th, 2003,

when the Aniols sent Barbara Allen $200,000 and that that $200,000 was sent to Kevin Kent, did the State prove beyond a reasonable doubt that a theft occurred on this occasion. You go through the charge. This is the law that applies. Go through this entire charge. Did the State prove beyond a reasonable doubt that this was a theft. Do it on this one, too. Every one of them.

(RR. IX – 66). But the defense itself never broke down each one and argued specifically how the evidence was insufficient on each transaction. Rather, the broad arguments made by the defense, such as "Kevin Kent *never* told anyone to look at that website," and "he gives an explanation for why this money is sent. Same with the Allens, *every time*," would have applied to *all* of the transactions (RR. IX – 66, 73) (emphasis added). Likewise, the prosecutor told the jury, "when you're going over the charge, as we discussed in voir dire, you can believe that one individual is out over $200,000, two individual victims are out over $200,000, or three or four individuals, as long as you have one individual who is out over $200,000." (RR. IX – 60-61). But there was no meaningful argument that some of the transactions were substantially different from the others, nor was there a need for such an argument.

The lower appellate court pointed to the following argument by the State as evidence of harm: "And if *for some reason* you thought that document, Defense Exhibit No. 2 [a settlement and release agreement signed by Allens and Aniols], should wipe away any criminal responsibility regarding the $975,000 that the Aniols loaned, Defense Exhibit 1 [a mutual general release signed by appellant and

28

Allens] sure doesn't. Because this document was executed by Barbara Allen, a loan [sic] on December 8th, 2005." *Kent*, 447 S.W.3d at 423 (emphasis added). But such a brief reference in an argument that spanned forty-four pages of the reporter's record did not amount to a concession that the evidence was stronger regarding the Allens than that regarding the Aniols (RR. IX – 56-100). Indeed, as indicated by the emphasized portion above, that brief reference was meant more to mock the appellant's only two exhibits rather than to draw a distinction in the level of proof between the victims. Therefore, the appellant was not harmed by any error in the jury charge, and the court of appeals erred in holding to the contrary.

## **PRAYER**

It is respectfully requested that the opinion of the court of appeals should be reversed and the conviction affirmed.

DEVON ANDERSON
District Attorney
Harris County, Texas


/s/ Eric Kugler
ERIC KUGLER
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
(713) 755-5826
kugler_eric@dao.hctx.net
TBC No. 796910

## CERTIFICATE OF SERVICE AND COMPLIANCE

This is to certify that: (a) the word count function of the computer program used to prepare this document reports that there are 6,964 words in it; and (b) a copy of the foregoing instrument will be served by efile.txcourts.gov to:

James Pons
Attorney at Law
10900 N.W. Freeway, Suite 230
Houston, Texas 77092
Jpons_78221@yahoo.com

Lisa McMinn
State Prosecuting Attorney
P.O. Box 13046
Austin, Texas 78711
Lisa.McMinn@SPA.texas.gov

/s/ Eric Kugler
**ERIC KUGLER**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-5826
TBC No. 796910

Date: March 3, 2015